CASE 71.—ACTION  BY  W.  K.  ELLIOTT  AND  OTHERS
        AGAINST  SARAH  P.  LESLIE  INVOLVING  A
        SETTLEMENT  OF  THE  ESTATE  OF  JAMES  H.
        LESLIE.—February 7.

## Elliott, &c., v. Leslie

Appeal from Pike Circuit Court.

A. J. KIRK, Circuit Judge.

From the judgment both parties appeal. Affirmed.

Parent and Child—Contract—Interest in Parents Estate—Sale—
    Validity—Advancement.—An agreement in writing between a
    father and son which recites: "in order to settle a suit
    between them and avoid litigation, and in consideration that
    my father has this day given me in cash $1,000 which I accept
    in full of all my present or future interest in his estate,"
    is not an enforceable contract; but in the settlement of the
    fathers estate the sum of $1,000 should be charged to the
    son as an advancement, whether it was so intended by the
    father or not.

YORK & JOHNSON for appellants.

The policy of the law is to uphold family settlements of law suits, and upon this proposition authorities are unnecessary.

M. W. MAYNARD, JAMES M. ROBERSON and E. D. STEPHENSON, attorneys for appellees.

### PROPOSITION · AFFIRMED.

1. The release or attempted sale by T. J. Leslie to his father of his present or future interest in his estate is not binding, because it was a sale of an expectancy and therefore void. See: (Wheeler v. Wheeler, 2 Met., 474; Beard v. Griggs, 1 J. J. Mar., 22; McCall v. Hampton, 98 Ky., 166.)

2. When fraud, oppression or unfair advantage appears in the sale, it will not be enforced. See: (McCall v. Hampton, supra; Wheeler v. Wheeler, supra; and Pomeroy's Eq. Jur., sec. 953.)

3. The $1,000.00 was paid to T. J. Leslie in consideration of the compromise of the law suit and should not be charged to T. J. Leslie as an advancement.

OPINION OF THE COURT BY JOHN D. CARROLL, COMMISSIONER—Affirming.

In 1899 James H. Leslie died intestate. He left surviving him several children and grandchildren. The only property he owned at his death was some real estate worth probably $3,000. An action was brought to have this real estate sold, and the proceeds divided among his heirs, and also for the purpose of settling his estate. This controversy is between the children of T. J. Leslie—a son of James H. Leslie—and the other heirs. In 1889 T. J. Leslie executed to his father the following contract, which was put to record in the clerk's office of the Pike county court: "Whereas, there is an unfortunate suit pending in the Pike circuit court of my father, James H. Leslie, against me; now, in order to settle said suit and avoid litigation, and in consideration that my father has this day given and paid to me in cash one thousand dollars, which I accept in full of all my present

and future interest in my father's estate, whether real, personal or mixed, and I hereby forever acquit, release and relinquish all right or claim to or in his estate, and will not claim any part of his estate as against him or any of his heirs or devisees. The payment as above stated is to be in full of any future interest in his said estate. The said J. H. Leslie is to pay the legal cost of suit between us, but not my lawyer's fee. This does not include my interest in my mother's estate." The children of T. J. Leslie insist: First, that this writing does not estop them from asserting their right to their father's interest in the estate of James H. Leslie; second, that the $1,000 mentioned in the writing should not be charged to them as an advancement, because it was paid as a compromise in settlement of a lawsuit at the time pending between their father and James H. Leslie. The other heirs contend that this writing was a valid agreement between T. J. Leslie and his father, and that, under its provisions, neither T. J. Leslie nor his children are entitled to any interest in the estate left by James H. Leslie. The chancellor held that the $1,000 mentioned in this agreement should be charged to T. J. Leslie as an advancement, and from this judgment both parties appeal.

It appears from the record that James H. Leslie had made advancements to all of his children, aggregating approximately about $1,200 each, so that T. J. Leslie received from his father practically the same amount as the other children. We do not consider it necessary to look into the question whether or not this writing was executed as a compromise, or to examine the purpose of its execution. It may be conceded that it was fairly entered into, and that by its terms T. J. Leslie attempted to accept the $1,000 in full satisfaction of all his prospective interest in the estate of his

father.   Viewing the paper from this standpoint, we will proceed to inquire into its validity for the purpose intended.

On more than one occasion this court has been called upon to pass upon the sufficiency of writings executed by a child conveying his prospective or anticipated interest in his parent's estate to another person, and, with two exceptions that will be noticed, has held that the attempted conveyance had no binding force or effect.   Thus, in McCall's Admr. v. Hampton, 98 Ky. 166, 17 Ky. Law Rep. 713, 32 S. W. 406, 33 L. R. A. 266, 56 Am. St. Rep. 335, Wade Hampton sold and conveyed with covenant of general warranty all the right and interest that he might thereafter become entitled to in his father's estate to his brother Charles H. Hampton.   After the death of the father, a creditor of Wade Hampton sought to subject his interest in his father's estate to the payment of his debt.   Charles H. Hampton asserted title to it under the deed made by his brother, and it was held that the interest of Wade Hampton did not pass by the deed, and that the creditor was entitled to subject it to the payment of his debt.   To the same effect is Alves v. Schlesinger, 81 Ky. 290, 5 Ky. Law Rep. 280; Wheeler's Exrs. v. Wheeler, 2 Metc. 474, 74 Am. Dec. 421.   It may be remarked that in neither of these cases did the parent execute any writing consenting to the conveyance, although in each of them it appeared that he had verbally assented to it. And some importance appears to have been attached by the court to the fact that no writing was executed by the parent consenting to the conveyance.   In Lee's Exr. v. Lee, 2 Duv. 134, one child purchased from another his interest in the estate of his father; the father agreed to the arrangement, and executed a writing obligating himself to give to the son who had

purchased that part of his estate that he had intended to bequeath to the child who sold—this writing being signed by the parent, as well as the child who sold his interest. It was held that by the writing the son parted with all his interest in his father's estate. In McBee v. Myers, 4 Bush, 356, Mrs. Craig, a daughter of McBee, with the consent of her father, sold to her brother Walter McBee all her right and interest in his father's estate. The father also executed a paper in which he affirmed his consent to the sale, and agreed to give Walter McBee the land intended for his daughter. The father having died intestate, Walter McBee was held entitled to the interest of Mrs. Craig in his estate. It will thus be seen that this court has held contracts of this kind binding when they were entered into with the written consent of the parent, but that without such consent they did not operate to divest the heir of his interest.

As an original proposition, it is difficult to understand upon what ground sales of expectancies of this character can be sustained, especially when it is kept in mind as a fundamental principle necessary to the validity of every bargain and sale that there must be a grantor, a grantee, and a thing in being to be granted. It may be said, however, that the courts generally are disposed to uphold the validity of these contracts, when they are evidenced by writing, signed by the parent, and fairly executed, free from any semblance of fraud or overreaching. In elaborate notes to Garcelon's Estate (Cal.), 38 Pac. 414, 32 L. R. A., 595, 43 Am. St. Rep. 134, and McCall's Admr. v. Hampton, 98 Ky. 166, 17 Ky. Law Rep. 713, 32 S. W. 406, 33 L. R. A. 266, 56 Am. St. Rep. 358, the authorities upon this subject are fully collected. The fact, however, that courts are reluctant to sustain these contracts, and have hedged them about with as

many conditions as possible in order to prevent their enforcement, is strikingly illustrated in all the cases that we have examined. In fact, the impression is left that the doctrine is adhered to on account of the fact that it is generally recognized, rather than because it is based on any sound reason. In Pomeroy's Equity Jurisprudence, section 953, the learned author, whilst stating that contracts of this character are valid and enforceable, remarks: "Heirs, reversioners, and other expectants, during the life-time of their ancestor, are considered as peculiarly liable to imposition and exposed to the temptation and danger of sacrificing their future interest in order to meet their present wants. Being sometimes in actual, but more often in imaginary, distress, they do not stand upon an equal footing with those who deal with them concerning their expectancies of estate. * * * In the second place, the dealings of heirs and reversioners with their expectant interests are often a gross violation of the moral, if not legal, duties which they owe to their ancestors who are the present owners of the property, and from and through whom their future estate will come, and may be a virtual fraud upon the rights of those parties. Equity therefore treats such dealings in expectancies as a possible fraud upon the heirs and reversioners, who are important parties to the transaction, and as a virtual fraud upon their ancestors, life tenants, and other present owners. All dealings by such expectants are not necessarily and absolutely voidable, but in every such conveyance or contract with an heir, reversioner, or expectant a presumption of invalidity arises from the transaction itself. It is not necessary to show, as a condition of relief, that the heir or reversioner was an infant, or that he was in a condition of actual distress when the bargain was made. A court of equity presumes dis-

tress. And the very fact of the sale or charge shows prima facie that he was not in a position to make his own terms, and that he submitted to have them dictated to him by the other party." This is not only a just but a vigorous denunciation of the sale of expectancies, and is supported by Story and other writers of recognized ability, and illustrates, as do the individual cases, the suspicion and distrust with which such transactions are viewed. The ground upon which these sales have been upheld is variously stated. Thus, in Ruple v. Bindley, 91 Pa. 296, the court said: "An assignment for a valuable consideration of demands, having at the time no actual existence, but which rests in expectancy only, is valid in equity as an agreement, and takes effect as an assignment when the demands intended to be assigned are subsequently brought into existence." Whilst Mr. Pomeroy, in section 1271, says: "The assignee of an expectancy, possibility, or contingency acquires at once a present equitable right over the future proceeds of an expectancy, possibility, or contingency. * * * There was an equitable ownership of property in abeyance, so to speak, which finally changed into an absolute property upon the happening of the future event. Equity permits the creation and transfer of such an ownership, while the original common law rejected every such notion." And he says, in section 1287: "Mere possibilities or expectancies are, according to the general course of decision, assignable in equity for a valuable consideration, and equity will enforce the assignment when the possibility or expectancy has changed into a vested interest or possession. The explanation is sometimes given that the assignment operates as a contract by the assignor to convey the legal estate or interest when it vests in

him, and equity will specifically enforce such contract by decreeing a conveyance.''

When it is considered that the heir under the conditions being investigated had no interest or estate whatever in the property of the parent, either remote or contingent, it strikes one at first blush as being out of the question that the bare possibility of having an interest at some future time can be made the subject-matter of a bargain and sale. As said in 2 Fearne on Remainders, 23: ''An expectancy or chance is a mere hope, unfounded in any limitation, provision, trust, or legal act whatever, such as the hope which an heir apparent has of succeeding to the ancestor's estate. This is sometimes said to be a bare or mere possibility, and at other times less than a possibility. It is a possibility in the popular sense of the term, but it is less than a possibility in the specific sense of the term 'possibility.' For it is no right at all in contemplation of law even by possibility, because, in the case of a mere expectancy, nothing has been done to create an obligation in any event, and where there is no obligation there can be no right, for right and obligation are correlative terms.'' We are not disposed to give our assent to a doctrine, however ancient or general it may be, that is rested upon so unsubstantial a foundation as the one that upholds the right of an heir to traffic in something that has no existence, and may never have. Take the case before us as an illustration. Here the child in consideration of $1,000 sells to his parent his interest in the parent's estate, and obligates himself not to assert in the future any claim to it. What did the heir sell? What did he have to sell? Absolutely nothing. What could the father have bought? What was the consideration for a conveyance of this character? The parent, if he saw proper to do so, was not estopped by this paper

from giving to the child other estate or property. He had the absolute right to dispose of his property as he pleased, and, if he had chosen to donate to his son, after this contract was made, $1,000 or $5,000, who could question his right to do so? If the parent had made a will and devised to this son a certain portion of his estate, would it be held that the devise was void, and that the father by entering into this agreement had barred himself from distributing his estate according to his wishes? Under our laws, that have been in force with few changes since the establishment of the State, the ancestor has been authorized to dispose of his estate during his life-time by way of advancement, or after his death through the medium of a will. And these methods have become a part of the settled laws of the State, familiar and acceptable to its people. And, if either of these means of disposition is not resorted to, and the owner of an estate dies intestate, the law of descent and distribution at once becomes operative, and, under its wise and salutary provisions, the undevised and undisposed estate is settled on those persons whom the law has selected as the objects of the decedent's bounty. As well said in McCall's Admr. v. Hampton, supra. "Some courts hold that the expectancy of an heir to inherit his father's estate is not an interest capable of assignment in equity any more than at law, and we agree with courts upon the question. It seems at this late day needless to discuss the wisdom and policy of the law which has been sanctioned for so many generations, and we do not feel called upon to defend it. A strict adherence to it will save multiplying contentions, protect the improvident child and heirs at law from fraud and deceit, save free and untrammeled the actions of the possessors of estates in their

distribution. If there were no other reasons for adhering to the rule, then those suggested would be all sufficient in our opinion for our doing so.''

The conclusions here announced may appear to be in conflict with the cases of Lee's Exr. v. Lee, and Mc-Bee v. Myers, but, if so, they are in harmony with the later and sounder utterances of this court as declared in Alves v. Schlesinger and McCall v. Hampton, as well as its judgment in Wheeler's Exrs. v. Wheeler. It seems to us that these latter cases materially modify, if they do not, in fact, overrule, the opinions upholding sales of expectancies when made with the consent of the parent. Indeed, these latter opinions cannot be reconciled with the earlier ones of this court. It is difficult to perceive any substantial difference between a sale of an expectancy without the written consent of the parent, and a sale with his consent. In neither case does the transaction rest upon any consideration, nor is it supported by any enforceable obligation. It is a mere technical distinction, without a sound difference, in keeping with the rule announced by some other courts of last resort that a conveyance of this character will be enforced if made with a covenant of warranty, but otherwise not. We therefore conclude that when the parent, under a contract like the one in question, advances to his child money or property, that it should be charged to the child as an advancement, and this is the sensible, reasonable, and legal effect of it. Under the statute, the intention of the donor is never consulted. It is immaterial whether he intended to charge the heir with the property donated or not, or what his purpose was in making the advancements. This rule will give reasonable effect to contracts of this character when they are entered into, and will carry out the purpose and intention of our laws.

The chancellor having charged the amount received under this contract as an advancement, his judgment is affirmed.